Jesse OUSLEY, Plaintiff,

v.

**TOWN OF LINCOLN THROUGH ITS FINANCE DIRECTOR,** Douglas Stewart, Lincoln Police Department, **Chief William Strain, Kevin Harty, Joseph Conti, Wayne Bouthillette, Scott Vincenzi, William Carnes,** Defendants.

No. 02–139S.

United States District Court, D. Rhode Island.

April 15, 2004.

Therese M. Caron, Esq., Providence, RI, for Plaintiff.

Marc DeSisto, defendant, DeSisto Law, Providence, RI, for Defendants.

### DECISION AND ORDER

SMITH, District Judge.

This case arises out of an altercation between Plaintiff Jesse Ousley ("Ousley" or "Plaintiff") and Defendant Kevin Harty ("Harty") that occurred at around midnight on August 29, 2000. Harty, an off-duty Lincoln, Rhode Island police officer, was driving on Walker Street in Lincoln when Ousley appeared in front of his vehicle. The details of what transpired next are in dispute, but it is uncontested that an altercation occurred, which ended with Lincoln police arriving on the scene and an injured Ousley later being escorted to the hospital by the police.

On March 22, 2002, Ousley filed a Complaint against Harty, the Town of Lincoln (the "Town"), the Lincoln Police Department (the "Department"), and several of its officers, containing the following causes of action: (1) violation of Ousley's civil

rights by Harty pursuant to 42 U.S.C. § 1983; (2) violation of his civil rights by the Town, pursuant to 42 U.S.C. § 1983, alleging that the Town failed to train and supervise its officers; (3) conspiracy by the individual Defendants to violate his civil rights under 42 U.S.C. § 1983; (4) supervisory liability under 42 U.S.C. § 1983 against Chief William Strain ("Strain"); (5) assault and battery; (6) malicious prosecution; and (7) intentional infliction of emotional distress.

Before the Court is the Defendants' Motion for Summary Judgment with respect to Counts I through IV, and Count VI. For the reasons that follow, the Defendants' Motion is granted in part and denied in part.

## I. *Background*

Around midnight on August 29, 2000, Ousley and his boyfriend, Robert Halle, were engaged in an argument on Walker Street in Lincoln. During the argument, Ousley walked backward into the path of an approaching car driven by Harty. Harty was forced to stop his car. Ousley banged his hands on the hood of Harty's car, and according to the Plaintiff, screamed "Go ahead. Hit me!" Harty, an off-duty Lincoln police officer, was not in uniform at that time and was driving his personal vehicle. Harty exited his car and an altercation ensued. Ousley contends that Harty was the aggressor in the altercation, and that after Harty landed his initial blows he chased Ousley to a fence along Walker Street and continued to beat and strangle him. Harty, however, contends that he had one brief altercation

with Ousley and then returned to his car to wait for police to arrive.

At the time of the altercation, a number of residents living along Walker Street dialed 911 to report the fight. According to Ousley, several of these residents yelled at Harty that they were going to contact the police, to which Harty responded "I am the police!" At some point during the altercation, Harty called a private line at the Lincoln Police Station and requested the assistance of fellow police officers.[1]

Upon their arrival on the scene, police officers found Ousley on the ground covered in blood. Harty's appearance also revealed injuries resulting from the altercation—a torn shirt and some skin abrasions. The police transported Ousley to the emergency room where he received treatment for injuries to his face, neck, arms, back, and legs. While Ousley was treated for his injuries, an officer remained outside of his hospital room.

After investigating the incident, the police brought three "wayward" petitions in Providence County Family Court against Ousley.[2] Upon review of the evidence, however, Family Court Justice Pamela Macktaz found Harty not to be a credible witness, and consequently dismissed all but one of the wayward petitions.[3]

## II. *Summary Judgment Standard*

Summary judgment's role in civil litigation is " 'to pierce the pleadings to assess the proof in order to see whether there is a genuine need for a trial.' " *De–Jesus–Adorno v. Browning Ferris Indus. of Puerto Rico, Inc.*, 160 F.3d 839, 841 (1st Cir.1998) (quoting *Garside v. Osco Drug,*

---

1. Harty contends that he was on the telephone with officers at the station at the time Ousley stepped into the path of his car. Harty further contends that he requested additional police presence only after Ousley struck his car.

2. Ousley was seventeen years old at the time of the altercation.

3. Ousley was found not guilty of assault and disorderly conduct, but was found guilty of malicious damage to property.

*Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). In other words, the nonmovant is required to establish that there is sufficient evidence to enable a jury to find in its favor. *De-Novellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997).

III. *Analysis*

 A. *Section 1983 and the Requirement of State Action*

 To bring a cause of action for violation of one's civil rights under § 1983, a plaintiff must establish two essential elements: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Mar-*

*tinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995) (quoting *Chongris v. Board of Appeals*, 811 F.2d 36, 40 (1st Cir.1987)); *accord West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

 Section 1983 is not implicated unless a state actor's conduct "occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office." *Martinez*, 54 F.3d at 986. In determining whether the conduct of the police officer (in this case, Harty) constituted private action or action attributable to the state, the First Circuit has warned district courts not to resort to "simplistic solutions." *Id.* Rather, this Court must differentiate between private and state conduct based on the totality of the circumstances. *See id.* at 987. When applying this standard, "[t]he key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law...." *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 46 (1st Cir. 1999) (citing *Martinez*, 54 F.3d at 986). Numerous factors such as the police officer's attire, an officer's duty status, whether a service revolver was used, and the location of the incident must be examined, but none is dispositive on its own. *See id.* at 45; *Martinez*, 54 F.3d at 986–87.

 Defendants argue that Harty was not acting under color of state law during the altercation because Harty's conduct, when viewed in the totality of the circumstances, was simply an act of private violence. Harty was in fact off-duty, in his personal vehicle, and did not use a gun, nightstick, or any other police accouterments during the altercation. These facts clearly weigh in the Defendants' favor. *See Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 449–50 (1st Cir.1997)

(upholding summary judgment where the officer was not in uniform and on medical leave); *Barna v. City of Perth Amboy,* 42 F.3d 809, 818 (3d Cir.1994) (noting that use of a police issued nightstick is "an objective indici[um] of police authority"); *Black v. Stephens,* 662 F.2d 181, 188 (3d Cir. 1981) (finding that officer who was on-duty and was wearing a jacket inscribed with a police insignia was acting under color of state law). Defendants also point out that mere self-identification as a police officer is alone insufficient to bring conduct under the color of state law. *See Parrilla–Burgos,* 108 F.3d at 446 (statements to fellow bar patrons that off-duty officer could "look dirty" at them because he was a police officer were insufficient to find liability).

Ousley, however, pulls together a number of facts that—when considered in the totality of the circumstances—could conceivably permit a fact finder to conclude that Harty acted under color of state law that night. First, Harty announced to bystanders at the time of the altercation that he "was the police"; second, Harty telephoned officers at the Lincoln police station via a private, non-emergency line and requested "assistance"; and third, Harty admitted during his deposition that he was acting in his capacity as a police officer at the time of the altercation.

This Court believes a reasonable fact finder could conclude that Harty was acting in his capacity as a police officer on August 29, 2000. There are simply too many genuine issues of material fact in dispute to warrant summary judgment. All of the facts involving the onset of the altercation, as well as Harty's attempt to subdue Ousley with force, his identification of himself to concerned bystanders as a

police officer, and his efforts to contact the police are all relevant to the question of Harty's status that evening, and all are disputed. Summary judgment as to Harty (Count I) is therefore denied.

B. *The Failure to Train Claim Against the Town and the Department*

 Count II of the Amended Complaint seeks damages against the Town and the Department under § 1983 for their alleged failure to "train and supervise" their officers.[4] In *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Of course, this does not mean that municipalities are completely insulated from suits under § 1983. *Id.* at 701, 98 S.Ct. 2018; *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (reaffirming the principle that "municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983"). Instead, the Supreme Court has held that there are "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Liability will only attach to a municipality when its "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197; *see Wilson v. Town of Men-*

---

**4.** Plaintiff characterizes Count II as "failure to train and supervise." However, because the allegations pertaining to that count focus only on the Defendants' failure to train, and

given that Count IV alleges a supervisory liability claim against Chief Strain, the Court reads Count II as a failure to train claim only.

*don,* 294 F.3d 1, 6 (1st Cir.2002). A municipality's failure to train must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—[to] be liable for such a failure under § 1983." *Canton,* 489 U.S. at 389, 109 S.Ct. 1197. Moreover, there must be a causal link between the municipality's action (or inaction) and the alleged constitutional deprivation. *See id.* at 390, 109 S.Ct. 1197.

In this case, Ousley alleges that the Town

> failed to train its police officers in the fundamental law of arrest, seizure and prosecution in that members of its Police Department engaged in a practice of using excessive force in bringing unwarranted criminal charges without due consideration for the protection of individual civil liberties.

Am. Complaint ¶ 39. Because this Court holds, *infra,* that the other individual Defendants did not conspire to violate Ousley's civil rights, the only municipal liability claim is the constitutional deprivation allegedly caused by Harty—the unlawful seizure of Ousley. *See Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018 (holding that a finding that a state actor committed an underlying constitutional violation is a prerequisite to municipal liability under § 1983).

■ Assuming the existence of a constitutional violation, the Town and the Department argue that there is no evidence that their failure to train Harty amounted to "deliberate indifference." Ousley contends, however, that he meets *Canton's* "deliberate indifference" standard with the following evidence: (1) Harty received little training in non-violent restraint after graduating from the police academy; (2) Chief Strain chose not to attend "sensitivity training" following Harty's altercation with Ousley; and (3) Harty admitted in his deposition that during the altercation he restrained Ousley by holding him in the

neck area. This Court finds that this proffer falls far short of the mark. The fact that Harty received little training in non-violent restraint in addition to his police academy training does not by itself indicate that the Town made a deliberate, conscious choice not to provide its officers with the appropriate training. Further, Plaintiff provides no logical connection between Chief Strain's decision not to attend sensitivity training sessions that occurred *following* the altercation and the alleged failure to train Harty. Finally, the fact that Harty held Ousley in the neck area during the altercation, does not evidence the municipality's deliberate indifference; it simply evidences Harty's conduct. This evidence, taken in the light most favorable to the Plaintiff, shows merely that the Town has employed a possible tortfeasor (albeit one who may have committed a tort under color of state law). This is not sufficient under *Canton* to create liability for a failure to train claim. Such a claim depends upon the Plaintiff's ability to connect the actions of the officer to the alleged deliberate indifference of the Department. *See, e.g., Carr v. Castle,* 337 F.3d 1221, 1229 (10th Cir.2003) (police department's failure to take corrective action despite knowledge that officers had engaged in the alleged unconstitutional conduct in the past meets causation requirement); *Snyder v. Trepagnier,* 142 F.3d 791, 798–99 (5th Cir.1998) (dismissing plaintiff's municipal liability claim because there was no evidence of a causal link between the lack of stress management training and injuries caused by allegedly over-stressed police officer); *Fernandez v. Leonard,* 963 F.2d 459, 468 (1st Cir.1992) (affirming jury verdict in favor of city on municipal liability claim when there was no evidence of a causal link between the failure to provide its officers with hostage training and the injuries suffered by the plaintiff). No such connection has been

made here, and therefore summary judgment is granted as to Count II of the Amended Complaint.

## C. *Conspiracy*

▇▇▇▇ In Count III of his Amended Complaint, Ousley alleges that the individual Defendants conspired to violate his civil rights by "falsely hav[ing] him arrested and prosecuted" in violation of the Fourth, Fifth, and Fourteenth Amendments. Am. Complaint ¶ 44–45. More specifically, he alleges that

a. Defendants agreed and acted intentionally to falsely have [Ousley] arrested and prosecuted;

b. Defendants agreed and acted to intentionally fabricate and contrive the charges lodged against [Ousley];

c. Defendants agreed and acted to intentionally submit false police reports, statements and testimony to support and corroborate these fabricated charges; and

d. Defendants agreed and acted intentionally to omit certain witness statements favorable to Plaintiff and failed to interview other witnesses to the assault.

*Id.* at ¶ 44. A § 1983 conspiracy is defined as "a combination of two or more persons acting in concert to commit an unlawful act, ... the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" *Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir.1988) (citations omitted). Whatever the alleged wrong, be it false arrest, an illegal seizure, or malicious prosecution, a plaintiff alleging a § 1983 conspiracy must establish " 'an actual deprivation of a right secured by the Constitution and laws.'" *Torres v. Superintendent of the Police of Puerto Rico,* 893 F.2d 404, 410 n. 8 (1st Cir.1990) (quoting *Brennan v. Hendrigan,* 888 F.2d 189 (1st Cir.1989)); *see Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir.2001). It is the plaintiff's burden to identify the specific constitutional right infringed. *See Nieves,* 241 F.3d at 53. Purely conclusory allegations of conspiracy are not adequate to state a claim, and Ousley must establish the existence of an agreement, express or tacit, between the individual Defendants to deprive him of a specific federal right. *See Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977). Evidence of the agreement may be direct or circumstantial. *See Earle,* 850 F.2d at 844–45.

The alleged constitutional violations in this case, the arrest and subsequent filing of the wayward petitions against Ousley, implicate the Fourth Amendment.[5] Ousley argues that the following facts demonstrate the existence of a conspiracy to violate his rights: (1) Harty assaulted Ousley; (2) Harty requested assistance from fellow Lincoln police officers; (3) the other officers arrived on the scene and transported Ousley to the hospital to receive medical attention, but failed to take a statement from Ousley regarding the altercation; (4) Defendant Bouthillette remained at the hospital while Ousley received medical treatment; (5) the Department failed to charge Harty, despite requests that they do so from Ous-

---

5. Although he did not specifically allege it in his Amended Complaint, Ousley argued in his Opposition to the Defendants' Motion for Summary Judgment that the Defendants also conspired to violate his Fifth Amendment right to counsel by failing to read him his *Miranda* rights when they brought him to the police station for questioning. However, even if the Amended Complaint could be read to assert such a claim, it would clearly fail to allege a constitutional deprivation. *See Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (the failure to read *Miranda* warnings does not violate an individual's constitutional rights and therefore cannot be grounds for a § 1983 action).

ley and his mother; (6) charges were pressed against Ousley; and (7) Department officers testified in Family Court against him, and failed to provide exculpatory witness statements until the middle of the trial.

It is hornbook law that a conspiracy requires an agreement between two or more individuals. In this case, Ousley's first alleged constitutional deprivation is his seizure resulting from Harty's conduct. Harty's alleged assault, however, took place well before any of the officers arrived on the scene. Accordingly, Ousley's conspiracy allegations must fail insofar as they purport to allege an agreement with respect to the altercation. There is simply no evidence that Harty conspired with anyone to assault Ousley.

To escape this rather self-evident predicament, Ousley contends that the officers, upon arriving at the scene, conspired to have him prosecuted. In other words, Ousley contends that the seizure was a continuum that began with the altercation and proceeded through the trial on the wayward petitions filed against him. Essentially, Ousley is alleging that the officers conspired to prosecute him maliciously. However, "[t]he fact that a plaintiff styles h[is] claim as a conspiracy to prosecute h[im] maliciously does not diminish h[is] need to show a constitutional deprivation." *Nieves,* 241 F.3d at 53. In *Nieves,* the First Circuit addressed whether a § 1983 claim for malicious prosecution could be based on an alleged Fourth Amendment violation. The plaintiffs brought suit against the arresting police officers under § 1983, alleging that the officers conspired to deprive them of their constitutional rights by initiating and prosecuting fraudulent criminal charges. In interpreting the plaintiffs' claim, the court held that

> [f]or a public official to transgress the Fourth Amendment through the initi-

ation and pursuit of criminal charges, the prosecution of those charges must at a bare minimum have occasioned a deprivation of liberty consistent with the concept of a seizure.

*Id.* at 54 (citing *Britton v. Maloney,* 196 F.3d 24, 28 (1st Cir.1999)). To reach the level of a seizure, the *Nieves* Court noted that "[g]enerally, the offending legal process comes either in the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure)." *Id.* Because the plaintiffs in *Nieves* were never arrested by warrant, the court looked to the possibility of post-arraignment deprivations of liberty. The court found that "[t]he appellants' position, by default, is that their liberty was restrained by a show of authority, manifested most clearly by a series of orders to appear before the court. By obeying these orders, the appellants assert, they yielded to a show of authority, completing the seizure." *Id.* at 55. The court rejected this argument and held that the plaintiffs failed to provide proof of any conduct amounting to a seizure.

■ Like the plaintiffs in *Nieves,* Ousley fails to show that as a result of being maliciously prosecuted he was deprived of any right protected by the Fourth Amendment. The facts, as presented to this Court, simply do not rise to the level of a Fourth Amendment violation. Ousley was not imprisoned as a result of the alleged conduct, nor was he even detained for a minimal period of time. *Compare Meehan v. Town of Plymouth,* 167 F.3d 85, 87 (1st Cir.1999) (plaintiff served time in prison as a result of alleged malicious prosecution). Ousley was forced to make appearances in court regarding the wayward petitions filed against him, but attendance at those hearings alone is insufficient to

amount to a constitutional deprivation. *See Nieves*, 241 F.3d at 56 ("While the imposition upon the appellants here was marginally greater than the imposition upon Britton—they were required to appear several times at the court's behest (including an appearance for trial)—the fact remains that the conditions of pretrial release to which they were subjected simply do not approach the level necessary to constitute a Fourth Amendment seizure."). Therefore, Ousley's § 1983 conspiracy claim must be dismissed for want of a constitutional deprivation. The Defendants' Motion for Summary Judgment with respect to Count III of the Amended Complaint is granted.

### D. *Supervisory Liability*

 Count IV seeks supervisory liability against Chief Strain under § 1983. "Supervisory liability under § 1983 'cannot be predicated on a respondeat theory, but only on the basis of the supervisor's own acts or omissions.'" *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 192 (1st Cir. 1998) (quoting *Seekamp v. Michaud*, 109 F.3d 802, 808 (1st Cir.1997)). Thus, to establish supervisory liability a § 1983 plaintiff must establish (1) subordinate liability, and (2) that "the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate." *Id.* (quoting *Seekamp*, 109 F.3d at 808). The affirmative link must entail " 'supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference.'" *Id.* (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir.1988)).

 In this case, Ousley alleges that Strain's failure to train his police officers personally, or in the alternative to monitor their training, rises to the level of indifference laid out in *Aponte Matos* and *Seekamp*. While Ousley asserts in his Opposition that Harty failed to train (and

presumably that Strain should have made him train) during the years following his graduation from the police academy, he provides not a shadow of a causal link between Strain's inaction and Harty's conduct. Consequently, the Defendants' Motion for Summary Judgment with respect to Count IV is granted.

### E. *Malicious Prosecution*

 In Count VI, Ousley contends that the Defendants maliciously prosecuted him when they brought the wayward petitions in Family Court. Rhode Island requires a plaintiff to prove four elements in order to recover damages for malicious prosecution: (1) the defendants initiated a prior criminal proceeding against him; (2) there was a lack of probable cause to initiate such a proceeding; (3) the prior proceeding was instituted maliciously; and (4) the proceeding terminated in the plaintiff's favor. *See Solitro v. Moffatt*, 523 A.2d 858, 861–62 (R.I.1987) (citing *Nagy v. McBurney*, 120 R.I. 925, 392 A.2d 365 (1978)). The elements of malice and lack of probable cause must be established by "clear proof." *Powers v. Carvalho*, 117 R.I. 519, 368 A.2d 1242, 1246 (1977).

The Defendants contend that the malicious prosecution claim must be dismissed because there was probable cause to charge Ousley with the Family Court petitions for the assault and battery of Harty, as well as disorderly conduct for intentionally blocking the street.

 Under Rhode Island law, " 'probable cause exists when facts and circumstances would lead an ordinarily prudent and careful person to conclude that the accused is guilty. . . . [I]t is sufficient that the facts known to the accuser provide reasonable grounds for a belief that criminal activity at the hands of the accused has occurred.'" *Rezendes v. Beaudette*, 797

A.2d 474, 479 (R.I.2002) (quoting *Clyne v. Doyle,* 740 A.2d 781, 783 (R.I.1999)).

 Lincoln Police Lieutenant Scott Vincenzi ("Vincenzi"), the shift supervisor the night of the altercation, testified in his deposition that he made the decision to charge Ousley while at the scene of the accident. He further testified that this decision was based on his interview with Harty, the injuries to Harty, and the visible damage to Harty's vehicle.[6] Vincenzi also considered information from an interview with Michael Facente, a neighbor who witnessed part of the altercation, in his decision to charge Ousley. This Court finds that this information provides a sufficient factual basis for determining that there was probable cause to charge Ousley. Other than what appears to be alleged bias in favor of Harty by his fellow officers, Ousley has provided no concrete evidence showing that Vincenzi lacked probable cause to charge him. While it is possible that Harty should also have been charged for his role in the altercation, that possibility alone does not negate the probable cause Vincenzi had to initiate the wayward petitions against Ousley. Moreover, it certainly does not rise to the level of "clear proof" required to establish a lack of probable cause. *See Powers,* 368 A.2d at 1246. Accordingly, the Defendants' Motion for Summary Judgment with respect to Count VI is granted.

## IV. *Conclusion*

For the reasons stated above, the Court hereby ORDERS as follows:

(1) Defendants' Motion for Summary Judgment as to Count I is DENIED;

(2) Defendants' Motion for Summary Judgment as to Count II is GRANTED;

(3) Defendants' Motion for Summary Judgment as to Count III is GRANTED;

(4) Defendants' Motion for Summary Judgment as to Count IV is GRANTED; and

(5) Defendants' Motion for Summary Judgment as to Count VI is GRANTED.

This matter shall be placed on the May trial calendar.

IT IS SO ORDERED.

---

6. The Defendants also attempt to rely on the " 'fellow-officer' rule," which permits law enforcement officers to rely upon another officer's personal knowledge of facts when forming a conclusion that a suspect has committed or is committing a crime. *See United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997). In light of the fellow-officer rule, the Defendants contend that Vincenzi could have relied solely on Harty's account of the facts underlying the altercation in order to have probable cause to charge Ousley with assault and battery. However, this argument is inconsistent with the Defendants' earlier argument that Harty was not acting under color of state law at the time of the altercation. On the night of the altercation Harty was acting as a police officer, or he was acting as a private citizen, not both—the Defendants cannot have it both ways.